## 8235. SOUTHERN RAILWAY COMPANY *v.* YOUNG.

Under the allegations in the petition as amended, it is clear that the injury resulted from failure on the part of the plaintiff to exercise ordinary care; and, notwithstanding the antecedent negligence of the railway company, no recovery could be based upon the facts alleged. The court therefore erred in overruling the general demurrer.

DECIDED JUNE 27, 1917.

Action for damages; from Jeff Davis superior court—Judge Highsmith. February 23, 1916.

*Bennet, Twitty & Reese, Bennett & Swain,* for plaintiff in error.
*Robert L. Berner,* contra.

WADE, C. J. In order that the precise ruling here made may be understood, the original petition filed by the plaintiff, and the amendment afterwards offered and allowed, are given in full, as follows:

"The petition of J. M. Young shows:

"1. That the Southern Railway Company, hereinafter termed defendant, is a corporation operating a railroad and having an office and agency in said county.

"2. That the defendant has injured and damaged your petitioner in the sum of twenty thousand ($20,000.00) dollars by the reason of the facts hereinafter set forth.

"3. That petitioner during the year 1914 was engaged in the purchase and shipment of cattle.

"4. That on the 14th day of August, 1914, he had purchased and shipped from Denton, a station of the Georgia & Florida Railroad Company, a number of cattle from said station of Denton to the city of Macon by way of Hazlehurst, and that upon the arrival of said cattle at Hazlehurst they were to be transferred to the

line of the defendant company and thence carried to the city of Macon.

"5. That on the evening of the said 14th day of August, 1914, he left the station of Denton and went to Hazlehurst, arriving there at 10:30 P. M. and upon his arrival he left the depot of the Georgia & Florida Railroad Company and went to the passenger depot of the Southern Railway Company to wait for the arrival of a north-bound train; that the agent of the defendant at said depot informed him that the train that he desired to take had already passed, but that there would be another train some time after midnight.

"6. Petitioner shows that he was interested in seeing his cattle transferred and carried by the next north-bound freight train of the defendant to the city of Macon, which freight train was due to arrive according to the information given him some time before midnight, and that he waited in the depot of the defendant for the arrival of such train for the purpose of attending to the transfer of his cattle for shipment that night to Macon.

"7. Petitioner shows that the Georgia & Florida Railroad track crosses the track of the defendant between a quarter and half a mile south of the passenger depot of the defendant, and at such crossing all trains are required to stop by the law of the State.

"8. That upon the arrival of his cattle at Hazlehurst that night, they were transferred to a side-track near a stock-pen of the defendant, and the car in which they were located and stock-pen were situated between the passenger depot of the defendant and the said railroad crossing, and they were to be attached or loaded on the freight train of the defendant company upon its arrival at Hazlehurst from this side-track or stock-pen.

"9. Petitioner shows that, after waiting in the passenger depot of the defendant for some time for the arrival of the train, he heard a north-bound train of the defendant blow for said railroad crossing, and this was between 12 and 1 o'clock.

"10. That the right of way of the defendant in front of its passenger depot and extending southward has been elevated by the defendant by enclosing the same within a stone or plank wall, and sand has been placed in said enclosed area for the convenience and advantage of passengers boarding and alighting from its train, and that said elevated walk or area extends between 30 and 50 yards south of said depot.

"11.  That there is a public crossing between the said passenger depot and the crossing where the Georgia & Florida crosses the defendant's track and said crossing is but a very short distance from the southern extremity of said elevated walk.

"12.  That upon hearing the whistle of the north-bound train below the railroad crossing, petitioner left the depot and started to go to the place where his cattle were, and see them shipped to Macon, and, in so doing, walked along by the side of the track of the defendant in a well marked path which had been long used by the public, and while so walking the engine of the defendant's train, which proved to be a passenger, and not a freight, train passed him at a rapid rate of speed, and some portion of said engine or some part of the coaches struck his left side and knocked him down and he was injured as hereinafter set forth, and he was struck before he could get out of the way of said rapidly moving train.

"13.  That he had arrived within a few feet of the public crossing when he was struck by defendant's train.

"14.  That as he approached said crossing he was in plain view of the agents and employees of the defendant operating said approaching engine, and was seen, or, in the exercise of ordinary care on their part, could and should have [been] seen by them as he was walking down said track and approaching said crossing.

"15.  That he knew that the crossing was a public crossing, and he did [not] anticipate or expect that said train would run over said crossing without checking its speed, but would slow up as required by law.

"16.  Petitioner shows that, instead of slowing up or stopping as they approached said crossing, they ran over the same and passed him at a speed of between 15 and 20 miles an hour.

"17.  That the agents and employees operating said train neither rang the bell nor blowed the whistle as they approached said public crossing.

"18.  That there was on said 14th day of August, 1914, in operation in the town of Hazlehurst an ordinance regulating the speed of locomotives and trains within its corporate limits, which prohibited a train from running within its corporate limits at a greater rate of speed than 10 miles per hour.

"19.  Petitioner shows that it was the duty of the defendant,

through its agents and employees operating said north-bound train, to have approached said public crossing at such a rate of speed as to have had the train under control in the event any person was approaching said crossing, or was on said crossing, or had just passed over; that it was the duty of said employees to have run the said train at a speed prescribed by the ordinance, to wit, not more than 10 miles an hour at said place; that it was the duty of said employees to have stopped said train when they saw, or in the exercise of ordinary care could and should have seen, petitioner walking by the side of said track, and approaching said public crossing, or in any event to have warned him of their approach and of his danger.

"20. Petitioner charges that the defendant, its agents and employees, were guilty of the following acts of negligence, each and all of which contributed to petitioner's injury:

"(a) In that said agents and employees operated said train at a greater rate of speed than 10 miles an hour, contrary to the ordinance of the town of Hazlehurst.

"(b) In that said agents and employees failed to observe the statute of the State known as the crossing law, and to so check said train as it approached the public crossing as to have had the same under control so as not to injure persons approaching said crossing, on said crossing, or just passed over said crossing.

"(c) In that the agents and employees operating said train failed to stop the same after discovering, or after they could and should in the exercise of ordinary care have discovered, the presence of petitioner close to said track.

"(d) In that the agents and employees of the defendant operating said train failed to warn petitioner of his dangerous proximity to said track after they discovered, or in the exercise of ordinary care could and should have discovered, his presence near said track.

"(e) In that the agents and employees operating said train, after they discovered, or in the exercise of ordinary care could or should have discovered, the presence of petitioner near said track, continued to run the said train at a speed of between 15 and 20 miles an hour.

"21. Petitioner was struck by said train on the left side and thrown violently to the ground, his left leg was broken above and

below the knee, and his left ankle was bruised and twisted, and that the said ankle had never healed and is still swollen and twisted, and he will never be able to use his left foot again; that two toes of his right foot were so severely mashed that they had to be amputated, and that said wounds have never healed, although more than 4 months have elapsed since the reception of his injury, that he has been confined to his bed since he was injured and has never been able to walk, and can only move from one place to another in roller chair; that he has suffered during all this time the most horrible pain, and will continue to suffer the same to the day of his death.

"22. That he has been compelled since his return from Hazlehurst to his home to employ a physician to attend upon him and has, outside of his medicines, incurred a physician's bill of between $100 and $200, and that said bill will necessarily continue to increase on account of his continued suffering and illness resulting from his injury.

"23. That petitioner is 61 years of age and is a farmer and cattle buyer.

"24. That by his farming operations and the purchase and sale of cattle [he] was earning $400 a month at the time of his injury, but that since said time he has earned nothing, nor will never be able to work again, and that his earning capacity has been totally destroyed.

"25. Petitioner sues for the loss of earning capacity, for the doctor's bill, and for his pain and suffering, past, present and future.

"Wherefore petitioner prays process may issue requiring the said defendant to be and appear at the next term of said court to answer petitioner's complaint."

"Now comes the plaintiff in the above stated case, and, by leave of the court first had, amends his petition therein as follows:

"1. By inserting after the words 'him' in the fourth line of the sixth paragraph of said petition the words 'by the agent of the defendant at its depot,' and between the words 'before' and 'midnight' and the fifth line, the words 'or about,' so that said petition thus amended will read as follows:

"'Petitioner shows that he was interested in seeing his cattle transferred and carried forward by the next north-bound freight

train of the defendant to the city of Macon, which freight train was due to arrive, according to the information given by the agent of the defendant at its depot, at some time before or about midnight, and that he waited in the depot of the defendant for the arrival of said train, for the purpose of attending to the transfer of his cattle for shipment that night to Macon.'

"2.   By adding to the end of the ninth paragraph the following allegations:

"'When said train blowed for said railroad crossing the agent of the defendant company at its depot informed petitioner that this was a freight train which was to take on his cattle and that the same would stop at the crossing of the Georgia & Florida Railroad, and would afterwards take on the car with his cattle in it, and that if he desired to see it was done he should go down and attend to it, and for this purpose he started down in the direction of the crossing for the purpose of attending to the transfer of his cattle.   It was the custom and rule of the defendant [not] to accept cattle from other roads if they were lying down, inasmuch, if they were lying down, they might be sick and not in good condition, and petitioner was going down to the place where his cattle [were], to see that they were on their feet and thus secure their being accepted and taken to Macon.'

"3.   By inserting between the words 'by' and 'the' in the sixth line of the 12th paragraph of said petition the following words:

"  'By large numbers of the public both day and night going between the depots of the defendant and the Georgia & Florida Railroad, with the knowledge and consent of the defendant.'

"And by adding to the end of the 12th paragraph as amended the following:

"'The path along which plaintiff was walking was in the town, with people living all around it, and who, as hereinbefore set forth, used the same both day and night.'

"4.   By adding to the 13th paragraph of said petition the following allegations:

"'Petitioner was approaching said crossing for the purpose of passing over the same and getting on the opposite side of the track when he was struck.'

"5.   By inserting after the word 'engine' in the third line of

the fourteenth paragraph the words 'for 150 or more yards' and by striking from the fourteenth paragraph of said petition the words 'or in the exercise of ordinary care on their part could and should have been seen by him' and inserting in lieu thereof the words 'by the agents and employees operating said trains,' and by adding [to] the said paragraph the following words: 'and said agent and employees could have easily stopped said train before they struck petitioner if they had exercised ordinary care in its operation.'

"6.  By adding to the nineteenth paragraph of said petition the following words: 'that it was the duty of said employees to have anticipated the presence of persons walking along said path by the side-track where petitioner was walking at the time of his injury and to have had their train under such control as to have avoided injuring anyone using said path.'  Petitioner shows that he believed said train was a freight train, as he had been informed by the agent, and that it would take on his cattle, and it being dark he couldn't tell as he walked down the path whether the said engine was coming towards him, or backing from him to couple on the car with his cattle, but thought that it was backing, and suddenly in a second it came on him at a great rate of speed, and before he could get away it sucked him in and injured him as herein set forth.

"7.  By adding to paragraph twenty an additional subdivision to be known as subdivision (f):

"'In that the agents and employees operating said train failed to anticipate the presence of persons along said path and in failing to so operate said train in anticipation of such presence as to have had it under such control as that they could have avoided injuring such persons.'

"8.  By adding to paragraph twenty an additional subdivision to be known as subdivision (g):

"'In that the agents and employees operating said train wilfully or wantonly continued to run said train at a great rate of speed after discovering the presence of petitioner close to the track, and, as a result of such wanton or wilful conduct in so running said train, petitioner was struck by the same and injured.'

"9.  Amend 17th paragraph by striking '15 and 20,' inserting in lieu thereof '30 to 35' an hour."

Every case of this character must stand largely upon its own

facts, and questions of negligence are questions of fact, and therefore come within the peculiar province of the jury; but nevertheless, where facts are considered on demurrer and any rational interpretation thereof requires the conclusion, as a matter of law, that there was a want of ordinary care on the part of the plaintiff, the demurrer should be sustained and the case ended without requiring the defendant to resist a possible recovery not authorized under the facts as alleged. The petition in this case does not allege that the path which the public habitually used and along which the plaintiff was walking was not a safe place, if properly used, or that it was not wide enough for the plaintiff to have placed himself in perfect safety by stepping away from the track of the oncoming train without leaving the path and without coming into contact with any obstruction upon the railroad track on the other side. The plaintiff was walking by the side of or near the track, and not upon it, and was going towards the approaching train with the knowledge that a train was expected, and with the purpose of meeting it. He proceeded along the side of the track until he saw the train approaching upon the particular track by the side of which he was walking. It is not alleged that he was blind or deaf, or that the locomotive with its attendant train of cars was proceeding noiselessly as it rushed rapidly along; and hence he must have seen and heard it approaching, and by the exercise of the smallest degree of care in taking one, or perhaps two, steps away from the track, he could have placed himself in a position of absolute safety, so far as any collision with the locomotive or cars might be concerned. Locomotives are ordinarily equipped with headlights; and, since this accident occurred after midnight, in the absence of any allegation to the contrary it is fair to assume that the headlight was burning and clearly visible by the plaintiff long before the locomotive reached him. In fact he alleges in his amendment that he "couldn't tell as he walked down the path whether the said engine was coming towards him or backing from him;" which at least implies that he saw the engine on the track by the side of which he was walking and knew it was in motion (and, as the night was dark, he must have seen it, by reason of the fact that it was lighted up in some way), but he made no effort to remove himself from his close and dangerous proximity to the track; and likewise, he alleges in paragraph 2 of the amend-

24

ment that the train blew for the railroad-crossing, and he was thus apprised of its approach and of the necessity for caution.

The case of *Central Railroad &c. Co.* v. *Smith*, 78 *Ga.* 694 (3 S. E. 397), is so nearly in point that we can not refrain from quoting an extract therefrom, which is in the graphic and lucid language of Chief Justice Bleckley: "The train was probably running at a much higher speed than it ought to have run so near to a crossing. There was some evidence tending to show that the speed was low; but grant that it was high, too high, and that there was very great negligence on the part of the railroad company, yet it is manifest that Smith was out of his place at the time he was injured. Grant that the track was often used by persons to walk along it; that there was no objection to such use; that Smith was there by implied or tacit license; he was there under circumstances that required him to have all his senses on the alert for trains, and to get out of the way when any of them approached. It would be flagrantly unreasonable and improbable to presume that he or any one else had the shadow of a right to use the track, especially at such an hour, on any other condition. The train was on its regular schedule time. He quietly walked along upon the track as if it belonged to him; the train struck him, knocked him down and broke his leg, those on the engine not seeing him or being aware of his presence. It was at least as much his business to look for the engine as it was the engineer's business to look for him. The engine was a much larger object than he was; it carried a headlight and could have been seen as far as he could. It was not possible for the engineer to have discovered him on the track sooner than he could have seen the headlight. The presence of the engine was more to be expected by him than his presence was to be expected by the engineer. He had much less reason to be surprised than the engineer had. As a matter of fact, to walk along the middle of a railroad track between crossings when it is dark, and without knowing and remembering whether a train is due or not, and without looking out in both directions for trains that may be due, and without listening attentively and anxiously for the roar and rattle of machinery as well as for the sound of bell or whistle, is gross negligence." The language of Judge Russell in the case of *Georgia Railroad Co.* v. *Williams*, 3 *Ga. App.* 272, 274 (59 S. E. 846), is aptly descriptive of this case: "The

allegations of the petition, so far from negativing the idea that the deceased, by the exercise of ordinary care, could have avoided the injury, make it apparent that if he had used his senses of sight and hearing in his own behalf in an ordinarily diligent way, the casualty could have been prevented." This court again said, in *Central of Georgia Railway Co.* v. *Mullins*, 7 *Ga. App.* 381, 386 (66 S. E. 1028): "If this be true, the deceased could have seen the approaching train some distance before it reached him, and he was charged with the duty of exercising ordinary care and diligence to see it and to avoid any injury by reason of the rapid speed with which it was approaching." See also *Western & Atlantic R. Co.* v. *Ferguson*, 113 *Ga.* 708 (39 S. E. 308, 54 L. R. A. 802), where the Supreme Court said: "If the negligence of the defendant was existing at the time the plaintiff was hurt, and he, in the exercise of that degree of care and caution which an ordinarily prudent person would exercise under similar circumstances, could have discovered the defendant's negligence, and, when discovered, could, by the exercise of a like degree of care, have avoided the same, then he can not recover." See also *Comer* v. *Shaw*, 98 *Ga.* 545 (25 S. E. 733); *Lloyd* v. *R. Co.*, 110 *Ga.* 167 (35 S. E. 170).

The plaintiff in this case (under the allegations in the original petition) was going along the side of the railroad-track to meet a train approaching thereon, which he had been informed by an agent of the defendant was coming, and which he had heard blow at the crossing, and which he in fact actually saw approaching, and yet he remained in a position so close to the track that he was struck and injured by the passing of the locomotive and cars, without being prevented by any intervening cause from placing himself at a greater distance from the track and in a place of safety. In the amendment, however, the plaintiff alleges further that while he was walking down the path by the side of the track, unable to determine whether the train was approaching or backing away from him, "suddenly, in a second, it came on him at a great rate of speed, and before he could get away it sucked him in and injured him," as alleged in the original petition. The allegation in the original petition (paragraph 12), that the plaintiff "was struck before he could get out of the way of said rapidly moving train," was not stricken by the amendment which added the allegation that the train of the defendant company "came on him at a great

rate of speed, and before he could get away it sucked him in and injured him." In other words, it appears that by one allegation in the petition the plaintiff stated that he was struck at the point where he was walking or stationed when the train passed, and by the other that where he was then stationed was actually outside of the danger zone and where he could not have been struck or injured but for the fact that the train passed at such a great rate of speed that he was pulled by suction under or against the engine or cars. As suggested in the brief of able counsel for the plaintiff in error, the theory that the injury resulted from the fact that the plaintiff was sucked under or against the engine or cars must be regarded from one of two standpoints, to wit: either this happening was likely to occur under the circumstances alleged to have existed at the time and place of the injury, in which event a man of ordinary prudence would be bound to guard against; or it was an unusual and extraordinary occurrence, not likely to happen, and which a man of ordinary prudence would not be bound to guard against. If it was something likely to happen, the plaintiff himself should have been on guard against the occurrence, as it was the result of a natural law which would be consequently a matter of common knowledge. If the occurrence was not likely to happen and was unusual and extraordinary, the defendant company could not be charged with negligence in not making an effort to stop the train after those in charge of it saw or could have seen the plaintiff walking by the side of the track, but not near enough to it to be struck by the passing engine or cars. If, under the operation of natural laws, those in charge of the train should have anticipated that the plaintiff would probably be sucked under, in, or close up to, or against the train, then the plaintiff would likewise have been bound to anticipate the same result. And if the accident was unusual and extraordinary, and the plaintiff in the exercise of ordinary care and diligence for his own safety could not have anticipated such result, neither could those in charge of the train be expected to anticipate this result.

In this connection see the decision in Davis *v.* Southern Railway Co., 170 N. C. 582 (87 S. E. 745), where it was said: "The improbability that plaintiff was sucked under the cars is by itself very great, when viewed in the light of his own testimony, and is really contrary to the physical law, but when we examine the other

evidence, it becomes conclusive that no such thing ever happened, and that he was injured by his own act. In L. & N. Railroad Co. v. Lawson, 161 Ky. 39, 170 S. W. 198 [L. R. A. 1917B, 1161], the court held a railroad company owed to a licensee walking near its tracks, and who knew of the approach of a train, no duty to slacken its speed of 25 or 30 miles an hour in order to prevent him from being sucked under the train, since, conceding the possibility of its occurrence, it is so remote that ordinary care does not require a railroad company to anticipate or guard against it. It was said in the opinion: 'The danger of striking a trespasser is infinitely greater than the danger of injuring a licensee by suction. Trespassers are frequently killed. The number of persons actually sucked under trains, even if such cases ever occur, is so infinitesimally small it would certainly be unreasonable to require railroad companies to reduce the speed of their trains for the purpose of avoiding such accidents. If there be any danger from suction, certainly a licensee who knows of the approach of a train, and has a reasonable opportunity to do so, must get away from the track a sufficient distance to avoid being injured in that way. In our opinion, the trial court erred in not directing a verdict in favor of defendant.' The same principle was declared in Graney v. St. L., I. M. & S. Railway Co., 157 Mo. 666 (57 S. W. 276, 50 L. R. A. 153). . . The utter improbability that he was sucked under the cars is shown by this story when compared with the other evidence, and our common knowledge that such is not the case at that part of a train, there being nothing to create a vacuum and cause an inrush of air, so as to create suction towards the car. The force of the air would be outward, centrifugal, rather than centripetal, and this is what knocked him down, if it be true that he fell and lost his leg in that way. It is more reasonable to conclude, as did the learned judge, even against the verdict of the jury, that the plaintiff's theory was incredible."

To sum up the whole matter, in the opinion of this court the petition did not, either as originally drawn or as amended, set forth a cause of action, and the trial court erred in refusing to sustain the general demurrer.

*Judgment reversed. George and Luke, JJ., concur.*